02-11-147-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00147-CV

 

 


 
 
 Charter Oak Fire Insurance Company
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 Gene Swanigan
 
 
  
 
 
 APPELLEE
 
 


 

 

----------

 

FROM THE 153rd
District Court OF Tarrant COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

 

I.  Introduction

          This
is an appeal from a judgment for Appellee Gene Swanigan on his workers’
compensation claim.  Appellant Charter Oak Fire Insurance Company argues in a
single issue that the judgment—which ordered Charter Oak to pay benefits in
accordance with the jury’s finding by a preponderance of the evidence that Swanigan’s
injury of May 18, 2006, was a producing cause of his reflex sympathetic
dystrophy (RSD)/complex regional pain syndrome (CRPS)—is not supported by the
evidence.  We will affirm.

II.  Factual and Procedural Background

A. 
Factual Background

          In
2001, Swanigan was working on a barbeque pit at his home, and the lid shut on
his right pinkie finger.  He went to the emergency room and later to a
specialist who performed surgery to put hardware in to correct his fracture. Swanigan
did not have any problems following the surgery and was later hired by CarMax
to perform auto reconditioning.  He was able to lift 110- to 120-pound
transmissions without pain.

          Approximately
five years after his initial injury, on May 18, 2006, Swanigan injured the same
right pinkie finger when he turned to grab a wrench as he was working on an SUV;
his finger got caught between the strut, CV axle, and spindle.  Swanigan
immediately knew that his finger was injured and went straight to management to
file a report.  Swanigan developed swelling and a large knot from the clear
part of his fingernail to his knuckle.  Swanigan also experienced “stabbing,
aching pain” that radiated up his arm.

          Swanigan
tried to work the week after his injury, but the pain forced him to leave and to
go to CareNow for treatment.  Swanigan was given a baseball finger splint, but
it did not alleviate the pain.  Swanigan said that it hurt him to move his right
pinkie finger.  Swanigan went to CareNow weekly after the injury, and the
doctor told him that he had a contusion.  Swanigan also underwent therapy for
the injury at HealthSouth.  Swanigan stated that “the pain just -- it’s
something that never goes away.”  Swanigan said that he was getting “a little
worse” and asked to see a specialist.  He was referred to Dr. Luiz Toledo.

          In
September 2006, Dr. Toledo removed from Swanigan’s finger the hardware that had
been inserted years earlier after the incident with the barbecue pit lid.  The
surgery did not relieve Swanigan’s pain.

          Dr.
Toledo performed a second surgery on January 24, 2007, and removed scar tissue
(a neuroma) that was compressing a nerve in Swanigan’s right pinkie finger.  Swanigan
said that the procedure went “okay,” but he still experienced pain.  Swanigan
stated that his pain level had consisted of “a lot of 10s” and that he had asked
Dr. Toledo to take the tip of his right pinkie finger off.  Dr. Toledo said
that there was no need for that and also told Swanigan that he had done all he
could for him.

          In
July 2007, Swanigan started seeing Dr. David B. Graybill, an anesthesiologist
at North Texas Pain Recovery, for help dealing with the pain.  Dr. Graybill’s
notes state that Swanigan presented with complaints of pain in the right upper
extremity following a work-related injury dated May 18, 2006.  The notes also
state that Swanigan had “complaints of pain in his little finger with altered
sensation, but also complaints of pain radiating up his arm and loss of use of
his arm secondary to his pain.”  Swanigan described the feeling in his arm as a
“burning. . . . real hard, high powered” pain that was like someone “had
plugged a[n] electric -- a 110 cord in the socket and felt like I had the naked
end on my arm.”  Swanigan said that the burning sensation felt like a hot ice
pack was stuck under his armpit all the time and that the sensation radiated up
the side of his head, making him feel like he had a football helmet on or had
“been hit with a few blows upside the head.”  Swanigan testified that the
medication he had been prescribed “do all right but it don’t do the best” and
that he did not like the side effects, which included not being able to
concentrate, being edgy, and not being able to sleep.

          After
Dr. Graybill’s examination, he noted that Swanigan’s 

[r]ight upper
extremity reveals cool, clammy hand and forearm.  He has altered sensation to
light touch of the right finger with some allodynia noted in the right forearm
and hyperalgesia.  He has diminished grip strength, but he is able to fully
bend his PIP joint of his little finger.  He has no motion in the DIP joint of
his little finger.

Swanigan
stated that the summary above was true at the time of Dr. Graybill’s
examination because he could move his finger at the time.  By the time of
trial, however, he could not bend his finger at all because it had gotten
worse.

          Dr.
Graybill’s notes further stated, “Impression:  Status post crush injury to the
right hand.  Chronic pain syndrome secondary to Chronic Regional Pain Syndrome,
Type Two.”  Dr. Graybill concluded that Swanigan would benefit from sympathetic
nerve blocks, and Swanigan had four such procedures over a month-long period.[2]  Swanigan said
that the sympathetic nerve blocks relieved the pain for a short while but did
not provide long-term relief.  When the pain returned, it was worse.  Swanigan
was treated by Dr. Graybill for approximately five months.  Dr. Graybill
prescribed a compression glove for Swanigan.  Swanigan said that the glove
holds in heat and helps cushion his hand if it gets bumped.

          Dr.
Graybill referred Swanigan to Dr. Charles E. Willis, II, an anesthesiologist,
and Swanigan went to see him on March 14, 2008.  Dr. Willis’s notes were
admitted into evidence.  Dr. Willis had noted,

Dr. Graybill has done
stellate ganglion blocks which have helped [Swanigan] 100 percent for two
days.  The pain now is about a 6 and a half out of 10 on a visual scale with
numbness and tingling in the right upper extremity.  Pain is associated with
changes in his hair and nail growth.  The nails grow very thin and there is
also increased perforation and burning in the right upper extremity as well as
changes with the weather.

Swanigan
testified that the nail on his right pinkie finger was growing deformed; was
“real, real thin”; and was outgrowing the other nails.  Dr. Willis further
noted that Swanigan’s pain was worse in the morning than at night and limited
his ability to work, exercise, have fun, and have sex and that his pain
increased with prolonged driving; Swanigan’s pain decreased with lying down and
medication.  Dr. Willis determined from his assessment that Swanigan had RSD,
which is another term for CRPS, of the right upper extremity.  Dr. Willis
concurred with Dr. Graybill that stellate ganglion blocks had been effective
and were warranted in Swanigan’s case.

          Swanigan
saw Dr. Martin D. Solomon, a neurologist, on September 22, 2008.  Dr. Solomon’s
progress note, which was admitted into evidence, states that Swanigan had
received nerve blocks and that his hand was discolored;[3]
Swanigan explained that sometimes his hand was a dull color and that sometimes
it was a shiny color.  Dr. Solomon concluded that Swanigan’s symptoms were
consistent with CRPS.

          Dr.
Mark A. Dirnberger, a pain management doctor, was treating Swanigan monthly at
the time of the trial.  Dr. Dirnberger prescribed Lyrica and hydrocodone for
the pain.  Dr. Dirnberger and Swanigan discussed a possible referral to have a
spinal stimulator surgically implanted to treat his RSD/CRPS.  Dr. Dirnberger’s
notes, which were admitted into evidence, state that he is going to assume
Swanigan’s pain management duties but that the remainder of Swanigan’s other
issues need to be managed by other physicians.

          Swanigan
testified that his pain affected his ability to live his life, even at the time
of trial.  He said that the chronic pain caused him to become easily irritated
and to “snap.”  Swanigan said that the pain had affected his ability to father
his children, including being unable to teach his daughter to drive and unable
to play ball with his son.

          At
the time of the trial, Swanigan’s pain was a six and a half on a scale of ten,
and he was taking Ambien to sleep because the pain interfered with his ability
to sleep.  The pain in his dominant hand also affected his ability to grip and
grasp.  Swanigan said that he could write but that his handwriting was “awful”
because his hand and whole arm twitched.

B. 
Procedural Background

          Charter
Oak accepted the crush injury to Swanigan’s right pinkie finger as part of his
compensable injury, accepted the surgery to remove the previously inserted hardware
from Swanigan’s right pinkie finger as part of his compensable injury, and accepted
the surgery to remove the neuroma from Swanigan’s right pinkie finger as part of
his compensable injury.  Following a contested case hearing on the issue of
whether Swanigan’s compensable injury extended to and included RSD/CRPS, the Division
of Workers’ Compensation (DWC) hearing officer issued a decision that the
compensable injury sustained by Swanigan did not extend to and include RSD/CRPS.

          Swanigan
appealed the hearing officer’s decision.  The DWC Appeals Panel adopted the
hearing officer’s decision and order.

          Swanigan
then appealed the DWC Appeals Panel’s decision by filing suit in district
court.  After a two-day trial, the sole question presented to the jury in the
court’s charge asked:

          Do you find
from a preponderance of the evidence that Gene Swanigan’s injury of May 18,
2006 was a producing cause of Gene Swanigan’s reflex sympathetic dystrophy
(RSD)/complex regional pain syndrome (CRPS)?

 

          You are
instructed that the Appeals Panel of the Texas Workers Compensation Commission
(TWCC) affirmed the Contested Case Hearing officer’s determination that Gene
Swanigan’s compensable injury did not extend to and include reflex sympathetic
dystrophy (RSD)/complex regional pain syndrome (CRPS).

 

          You are
further instructed that you are not bound by the decisions of the Appeals Panel
or the Contested Case Hearing officer.  However you may consider their
decisions as evidence and accord them such weight, if any, as you may choose. 

 

          Answer Yes
or No. 

          

          Answer:  YES  [4]


Swanigan
moved for judgment on the verdict, and the trial court ordered Charter Oak to
pay benefits in accordance with the jury’s verdict.  Charter Oak now appeals. 
Charter Oak raises one issue on appeal, challenging various aspects of the
legal and factual sufficiency of the evidence to support the jury’s verdict. 

III.  Charter Oak’s Factual Sufficiency Challenges

          To
the extent that Charter Oak’s sole issue mounts challenges to various aspects
of the factual sufficiency of the evidence, we hold that Charter Oak did not
preserve any factual sufficiency complaints for our review.  See Tex. R.
Civ. P. 324(b)(2) (requiring a motion for new trial be filed to preserve a
complaint of factual sufficiency to support a jury finding); Cecil v. Smith,
804 S.W.2d 509, 510–11 (Tex. 1991) (recognizing motion for new trial raising
factual sufficiency complaint is necessary to preserve that alleged error); In
re C.E.M., 64 S.W.3d 425, 427 (Tex. App.––Houston [1st Dist.] 2000, no
pet.) (“There is only one way to preserve a factual sufficiency challenge: 
include the complaint in a motion for new trial.”).  Charter Oak did not file a
motion for new trial; thus, its factual sufficiency complaints are not
preserved for our review.  See Tex. R. Civ. P. 324(b)(2); Cecil,
804 S.W.2d at 510–11; C.E.M., 64 S.W.3d at 427.  We overrule the
portions of Charter Oak’s sole issue that challenge the factual sufficiency of
the evidence.

IV.  Charter Oak’s Legal Sufficiency Challenges

A.  Standard of Review

We may sustain a legal sufficiency challenge only when
(1) the record discloses a complete absence of evidence of a vital fact, (2)
the court is barred by rules of law or of evidence from giving weight to the
only evidence offered to prove a vital fact, (3) the evidence offered to prove
a vital fact is no more than a mere scintilla, or (4) the evidence establishes
conclusively the opposite of a vital fact.  Uniroyal Goodrich Tire Co. v.
Martinez, 977 S.W.2d 328, 334 (Tex. 1998), cert. denied, 526 U.S.
1040 (1999); Robert W. Calvert, “No Evidence” and “Insufficient Evidence”
Points of Error, 38 Tex. L. Rev. 361, 362–63 (1960).  In determining
whether there is legally sufficient evidence to support the finding under
review, we must consider evidence favorable to the finding if a reasonable
factfinder could and disregard evidence contrary to the finding unless a
reasonable factfinder could not.  Cent. Ready Mix Concrete Co. v. Islas,
228 S.W.3d 649, 651 (Tex. 2007); City of Keller v. Wilson, 168 S.W.3d
802, 807, 827 (Tex. 2005).

Anything more than a scintilla of evidence is legally
sufficient to support a jury finding.  Cont’l Coffee Prods. Co. v. Cazarez,
937 S.W.2d 444, 450 (Tex. 1996); Leitch v. Hornsby, 935 S.W.2d 114, 118
(Tex. 1996).  More than a scintilla of evidence exists if the evidence
furnishes some reasonable basis for differing conclusions by reasonable minds
about the existence of a vital fact.  Rocor Int’l, Inc. v. Nat’l Union Fire
Ins. Co. of Pittsburgh, PA, 77 S.W.3d 253, 262 (Tex. 2002).  When the
evidence offered to prove a vital fact is so weak as to do no more than create
a mere surmise or suspicion of its existence, the evidence is no more than a
scintilla and, in legal effect, is no evidence.  Kindred v. Con/Chem, Inc.,
650 S.W.2d 61, 63 (Tex. 1983).

B.  Disposition of Charter Oak’s Subissues 1,
3, 4, and 5

As
to the legal sufficiency challenges raised by Charter Oak in its sole issue,
Charter Oak argues that legally insufficient evidence exists to “establish that
Mr. Swanigan suffered from complex regional pain syndrome and that his
compensable injury was a producing cause of that condition.”  Within its sole
issue, Charter Oak raises five subissues, arguing (1) that expert opinion
testimony was required, (2) Swanigan’s expert testimony was conclusory, (3)
Swanigan’s expert opinion testimony contained an analytical gap, (4) Swanigan’s
expert opinion testimony failed to exclude other possible causes, and (5)
Swanigan’s other medical reports were insufficient to establish causation.  We
address these subissues as well as Charter Oak’s two overarching legal
sufficiency challenges.

In
subissue one, Charter Oak argues that expert testimony is required to support a
diagnosis of CRPS.  Case law supports Charter Oak’s argument, see City of
Laredo v. Garza, 293 S.W.3d 625, 632 (Tex. App.—San Antonio 2009, no pet.)
(stating that laypersons do not have the common knowledge and experience to
adequately evaluate the cause of CRPS), and, as set forth below, Swanigan provided
expert testimony concerning his diagnosis of CRPS through Dr. Graybill’s
testimony and through the medical records of Dr. Graybill, Dr. Toledo, Dr.
Willis, and Dr. Solomon.  We overrule Charter Oak’s first subissue.

Concerning
subissue three, Charter Oak did not object to the expert opinion testimony
presented by Dr. Graybill; thus, on appeal Charter Oak may challenge only whether
Dr. Graybill’s testimony was conclusory and therefore constituted no evidence. 
See City of San Antonio v. Pollock, 284 S.W.3d 809, 817 (Tex. 2009) (explaining
that an objection is required to preserve an appellate challenge to an expert’s
reliability, methodology, technique, or the foundational data used by the expert);
Coastal Transp. Co. v. Crown Cent. Petroleum Corp., 136 S.W.3d 227, 234
(Tex. 2004) (holding that an objection to expert testimony is not required to
preserve a no-evidence challenge to conclusory expert testimony); In re
Conley, No. 09-10-00383-CV, 2011 WL 4537938, at *5 (Tex. App.—Beaumont
Sept. 29, 2011, no pet.) (mem. op.) (holding that reliability challenge
regarding an analytical gap was not preserved for appellate review in the
absence of an objection).  Because Charter Oak did not object to Dr. Graybill’s
testimony, we hold that Charter Oak’s analytical-gap complaint concerning Dr.
Graybill’s testimony is not preserved for our review.  We overrule Charter
Oak’s third subissue.

Concerning
Charter Oak’s fourth subissue––its contention that Swanigan’s expert opinion
testimony is insufficient because it failed to exclude other possible causes––Charter
Oak points to and we have located no evidence in the record of another cause
for Swanigan’s RSD/CRPS.  A medical causation expert need not “disprov[e] or
discredit[] every possible cause other than the one espoused by him.”  Viterbo
v. Dow Chem. Co., 826 F.2d 420, 424 (5th Cir. 1987).  When evidence of
other plausible causes of the injury or condition is admitted, and that
evidence could be negated, then the proponent of expert causation testimony should
offer evidence negating the other plausible causes.  See Merrell Dow
Pharm., Inc. v. Havner, 953 S.W.2d 706, 720 (Tex. 1997).  But here, no
evidence was admitted of other plausible causes of Swanigan’s RSD/CRPS.[5] 
Moreover, the jury question required the jury to find only that Swanigan’s May
18 injury was a producing cause of his RSD/CRPS, and the jury was
specifically instructed that “[t]here may be more than one producing cause.”  Thus,
in this case, based on the record before us and the charge given, the jury was
not required to find that all other possible causes of Swanigan’s RSD/CRPS had
been excluded, and Swanigan’s expert was not required to give testimony
excluding all other possible causes for his RSD/CRPS.  We overrule Charter
Oak’s fourth subissue.

In
its fifth subissue, Charter Oak complains that Swanigan’s other medical reports
were insufficient to establish causation.  No requirement exists, however, that
Swanigan’s other medical records independently establish causation.  Moreover,
Charter Oak did not object to the admission of the medical records/reports of
Dr. Graybill, Dr. Toledo, Dr. Willis, or Dr. Solomon.  These unobjected-to
medical records support Dr. Graybill’s expert causation testimony.  We overrule
Charter Oak’s fifth subissue.  See generally State Office of Risk Mgmt. v.
Escalante, 162 S.W.3d 619, 625 (Tex. App.—El Paso 2005, pet. dism’d)
(holding evidence, which consisted of claimant’s testimony and medical records
of treating physician, legally sufficient to support jury’s findings on
compensable injuries sustained by Appellee to his lumbar and spine and in the
form of cervical root lesions).

C.  Charter Oak
Waived its Legal Sufficiency Complaint

Concerning the
Evidence that Swanigan Suffered from RSD/CRPS

by Failing to Object
to the Charge.

 

In
its sole issue, Charter Oak asserts two overarching legal sufficiency
challenges:  first, that the evidence is legally insufficient to establish that
Swanigan suffered from complex regional pain syndrome; and second, that the
evidence is legally insufficient to establish that Swanigan’s compensable
injury was a producing cause of that condition.  Concerning Charter Oak’s legal
sufficiency challenge to the evidence that Swanigan suffered from RSD/CRPS, we
note that, as set forth above, the only question submitted to the jury in the
court’s charge was

Do you find from a
preponderance of the evidence that Gene Swanigan’s injury of May 18, 2006 was a
producing cause of Gene Swanigan’s reflex sympathetic dystrophy (RSD)/complex
regional pain syndrome (CRPS)?

Swanigan
points out in his brief that this question assumes that Swanigan suffers from
RSD/CRPS.

A
jury question is objectionable if it assumes the existence of disputed facts.  See,
e.g., UMLIC VP LLC v. T & M Sales & Envtl. Sys., Inc., 176
S.W.3d 595, 608 (Tex. App.—Corpus Christi 2005, pet. denied) (“A submission to
the jury is objectionable if it assumes a disputed fact in issue”).  Typically,
a jury question that assumes a disputed fact may be fixed upon objection by
inserting the phrase “if any” or by conditioning language at the beginning of
the jury question.  But Charter Oak did not assert any objection to the jury
question here.

Because
Charter Oak did not object to the charge, we are required to analyze its challenge
to the legal sufficiency of the evidence in light of the charge given without
objection.  See, e.g., Wal-Mart Stores, Inc. v. Sturges, 52 S.W.3d 711,
715 (Tex. 2001) (explaining that Wal-Mart’s no-evidence challenge “must be made
in light of the jury charge that the district court gave without objection”).  And
the charge actually given here—which asks only whether Swanigan’s injury of May
18 was a producing cause of his RSD/CRPS—assumes Swanigan suffers from RSD/CRPS. 
The jury was not asked whether Swanigan suffered from RSD/CRPS; the jury was
told that he did and asked only whether the May 18 injury was a producing cause
of the RSD/CRPS.

Because
the charge told the jury that Swanigan suffered from RSD/CRPS, and because Charter
Oak did not object to the charge, we hold that Charter Oak has waived its legal
sufficiency challenge to the evidence on whether Swanigan suffered from RSD/CRPS. 
We overrule Charter Oak’s sole issue, including subissue two, to the extent
that it challenges the legal sufficiency of the evidence to establish that
Swanigan suffered from RSD/CRPS.[6]

D.  Alternatively, Legally
Sufficient Evidence Exists that Swanigan Suffers From RSD/CRPS, and Legally
Sufficient Evidence Supports the Jury’s Finding that Swanigan’s Injury was a Producing
Cause of his RSD/CRPS

 

We
next address Charter Oak’s contention, raised in its sole issue and its second
subissue, that the evidence is legally insufficient to establish that
Swanigan’s May 18 injury was a producing cause of his RSD/CRPS.

We first
set forth the expert opinion testimony heard by the jury.

1.  Expert Opinion Testimony

Three
experts testified:  Dr. Graybill for Swanigan and Dr. Mitchell and Dr.
Chandrakar for Charter Oak.

a. 
Dr. David Bruce Graybill

          Dr.
Graybill is an anesthesiologist with a subspecialty in pain management.  He has
practiced medicine for over twenty-seven years and estimated that he had treated
five to twenty patients per year with CRPS.

          When
Swanigan first saw Dr. Graybill on July 25, 2007, Swanigan’s right upper
extremity was cool, his hand and forearm were clammy, he had altered sensation
to light touch of his right pinkie finger with some unusual pain sensations in
his right forearm, he had weakened grip strength, and he was unable to bend the
middle joint of his right pinkie finger.  Dr. Graybill’s diagnosis was
“[h]ealed crush injury to right hand, chronic pain syndrome with Chronic
Regional Pain Syndrome Type II or causalgia.”[7] 

Dr.
Graybill testified that the hallmark signs and symptoms of CRPS Type II are
temperature changes, increased perspiration to the hand, color changes to the
hand, and increased sensitivity to types of sensations or feelings that
normally are not painful.  Dr. Graybill testified that Swanigan had each of
these specific hallmark symptoms (except color change because Swanigan is
African American).  Dr. Graybill explained that Swanigan’s crush injury to his right
hand and the required surgical excision of the neuroma from the nerve at the
location of the crush injury caused Swanigan to establish a sympathetic
mediated pain—a situation where the sympathetic nervous system is involved in
creating an atypical pain pattern; this is Type II CRPS or causalgia.  Dr. Graybill
testified that Swanigan’s CRPS was caused by his May 18 on-the-job injury.

          Dr.
Graybill treated Swanigan’s CRPS for over fourteen months; Dr. Graybill saw
Swanigan between twenty-one and thirty times during that time period.  Dr.
Graybill felt “fairly confident” about his diagnosis of CRPS and testified that
his diagnosis did not change throughout the time that he treated Swanigan.

          On
cross-examination, Dr. Graybill conceded that he was not familiar with the
fourth edition or the fifth edition of the AMA Guides  and did not use
them or any peer-reviewed publications to obtain the criteria that he looked
for in diagnosing CRPS; instead, the hallmark signs of CRPS that he testified
about came from his training and experience.

          Dr.
Graybill assumed that Swanigan had undergone x-rays of his injured upper extremity
and hand but said that he did not review them because it was not his practice
to refer to a patient’s x-rays in trying to determine whether a patient had
CRPS.  Dr. Graybill was not sure whether Swanigan had undergone a triple-phase
bone scan and was not aware of what particular findings might be expected on a
triple-phase bone scan of an individual who has CRPS.

          Dr.
Graybill testified that if an individual has CRPS, he would anticipate changes
in the skin and possibly the hair growth on the affected body part, possible changes
in the coloration in the nail bed, changes in the temperature of the affected
extremity, sweating, and atrophy of the affected musculature.  Regarding
circulatory changes, Dr. Graybill would expect to see vasoconstriction, meaning
diminished circulation, and explained that changes in air temperature may affect
the extremity.

          Dr.
Graybill saw Swanigan a year after the accident, at which time he was in the
chronic phase instead of the acute phase of his CRPS.[8]
 Dr. Graybill testified that Swanigan’s sympathetic mediated symptoms were very
active but that they seemed to improve during the treatment with the
sympathetic nerve blocks.  For instance, Swanigan returned to work with
limitations in July 2008, he had improved function and less pain, and the signs
of the sympathetic mediated pain had lessened.  The signs of the sympathetic
mediated pain that had lessened included that on June 24, 2008, Swanigan’s palm
was of normal color, and the allodynia and hyperalgesia had gone away.  However,
some of Swanigan’s symptoms returned after the nerve blocks wore off.

          On
October 14, 2008, Dr. Graybill wrote that it was necessary for him to withdraw
from further professional attendance or treatment of Swanigan because Dr.
Graybill did not feel like he could provide any further care to Swanigan,
Swanigan desired more care, and Swanigan had asked for another doctor.  Dr.
Graybill explained that Swanigan wanted answers and solutions that Dr. Graybill
was not able to provide.  At the time that Dr. Graybill discontinued his
physician-patient relationship with Swanigan, he felt that Swanigan was at a
point of maximum medical improvement and that he had done all he could to help
Swanigan.  Dr. Graybill’s opinion was that Swanigan still had CRPS on October
14, 2008, and that it was still chronic.  Dr. Graybill said that most of his
findings were subjective when he made the diagnosis of CRPS with Swanigan.

          On
redirect, Dr. Graybill said that no consistent objective findings exist for the
diagnosis of CRPS; instead, some patients have some of the hallmark objective
symptoms while other patients suffer from different hallmark objective
symptoms.  Dr. Graybill reiterated that he had relied upon his twenty-seven
years of training and experience in diagnosing CRPS.

          Although
Dr. Graybill was unaware of Swanigan’s prior 2001 injury to his right pinkie
finger, Dr. Graybill testified that if Swanigan had broken his right pinkie
finger in 2001 and had experienced no CRPS symptoms after the 2001 break through
the time of the work-related injury, those facts would strengthen his opinion
that Swanigan’s May 18, 2006 work-related injury caused his CRPS.  Assuming
that Swanigan did not have any signs or symptoms of CRPS from 2001 to 2007, Dr.
Graybill’s opinion would be that Swanigan’s work-related injury caused his
CRPS.

b. 
Dr. William Horace Mitchell

          Dr.
William Horace Mitchell, an orthopedic surgeon, saw Swanigan at the request of
the workers’ compensation carrier.[9]  Dr. Mitchell testified
at his deposition, which was played at trial, that RSD is a “real controversial
subject in medicine.”  The exact cause is not known as far as he can tell.

          Dr.
Mitchell relied on the AMA Guides in stating that the criteria for RSD
are vasomotor changes (e.g., temperature regulation, color, swelling) and
sudomotor changes (e.g. dry skin or increased sweating, decreased range of
motion, atrophy of the skin).  Atrophy could be of the hair, skin, or nails.  Of
the eight criteria for RSD, five are needed to make that diagnosis.  Dr. Mitchell
testified that the fifth edition of the AMA Guides expands the trophic
changes of the criteria for CRPS, and eight out of eleven signs must be present
for a diagnosis of CRPS.  The criteria include color change; temperature change,
cold usually; increased sweating; and dry skin, while the trophic changes
include change in motion, nail changes, atrophy, shiny skin, and decreased range
of motion from stiffness. 

          Dr.
Mitchell testified that the objective tests that are recommended when
attempting to diagnose or rule out RSD and CRPS are x-rays and triple-phase
bone scans.  An x-ray would show generalized osteoporosis or loss of bone
substance (calcium) from the bones, while a triple-phase bone scan would show
increased uptake by the radioactive dye around the joints of the extremity and
would show periarticular changes.  Dr. Mitchell testified that an x-ray or a
triple-bone scan, in and of itself, is insufficient to diagnose RSD or CRPS. 

          Dr.
Mitchell explained that stellate ganglion blocks may relieve pain in a patient
who has the cardinal signs for RSD/CRPS.  But he testified that even if a
patient receives relief from the ganglion blocks, that is not enough to
diagnose RSD/CRPS without the vasomotor, sudomotor, and trophic changes.

          Dr.
Mitchell examined Swanigan on January 7, 2009.  Dr. Mitchell testified that
Swanigan complained of pain in his right arm, which would be consistent with
RSD/CRPS.  But Dr. Mitchell’s opinion, which was based on his examination of
Swanigan and his review of the triple-phase bone scan, was that Swanigan did
not have any of the objective findings or criteria to make a diagnosis of RSD.  Dr.
Mitchell examined Swanigan’s hand and found no vasomotor, sudomotor, or trophic
changes.  Dr. Mitchell testified that the triple-phase bone scan showed
findings consistent with arthritis and trauma, not findings that would
typically be seen with RSD.  Dr. Mitchell testified that the x-ray showed
evidence of old trauma involving the fifth finger, as well as some screws
broken off in the middle bone of the finger.  The radiology report indicated
that the bone density was adequate; it did not mention any decreased bone
density or diffuse osteoporosis.  Dr. Mitchell did not believe that the
work-related injury caused RSD or CRPS because he concluded that Swanigan did
not have RSD or CRPS.

          On
cross-examination, Dr. Mitchell conceded that a crush injury is the type of
injury that can lead to CRPS or RSD, though sometimes the CRPS or RSD does not
set in immediately.  Dr. Mitchell also agreed that the hallmark complaint of
RSD is a burning sensation that is not explainable through the original injury.
 Dr. Mitchell testified that RSD would not occur immediately because the
turnover in bone is slow, and it would take a while to appear.  If Dr. Mitchell
suspected that a patient had RSD, he would not treat the condition but would
refer the patient to a pain management specialist or a neurologist.

          Although
Dr. Solomon had noted that Swanigan’s finger was cool to the touch with edema,
Dr. Mitchell did not feel any difference in temperature in Swanigan’s finger and
reported that Swanigan’s nails were normal.  Additionally, Dr. Mitchell was not
aware that Dr. Willis, who was board certified in anesthesiology, had noted on
March 14, 2008, that Swanigan had positive trophic changes of the nail bed. 

          On
redirect, Dr. Mitchell said that if he was trying to rule out RSD, then he
would use the findings and signs in the AMA Guides.  Dr. Mitchell
testified that when he examined Swanigan, “[t]here were no objective findings
on the physical examination that met any of those criteria [from the AMA
Guides].”

          Dr.
Mitchell testified that any physician who runs a clinical practice should be
able to diagnose CRPS or RSD.  Thus, Dr. Mitchell testified that if a patient
presented with no signs of RSD or CRPS but had subjective complaints of
subjective symptoms, he would refer the patient to a neurologist because he
could not make a diagnosis and that “[m]aybe it’s something else.”

          Dr.
Mitchell testified that Dr. Solomon’s report and Dr. Willis’s report concerning
their examinations of Swanigan did not change his opinion because each report
contained “isolated” findings—one documented swelling, coolness to the touch, edema,
and subjective complaints of burning; the other documented pain and a trophic
nail change—but not the “whole constellation” of findings for a diagnosis of
RSD or CRPS.

c. 
Dr. Kunjeelal Chandrakar

          Dr.
Kunjeelal Chandrakar, who is board certified in general surgery and runs a
family practice part-time, examined Swanigan as a designated doctor.[10]
 Dr. Chandrakar testified that he did not have a lot of experience with
patients who had signs of CRPS because he usually refers them to hand surgeons
or to pain management if chronic pain develops.  Dr. Chandrakar testified that
he did not continue treating patients with chronic pain who were likely to
develop serious problems.

          Dr.
Chandrakar examined Swanigan for the first time on September 21, 2007, as a
designated doctor in order to address maximum medical improvement and
impairment rating.  During Dr. Chandrakar’s examination of Swanigan, he did not
notice (1) any change in skin color on the finger or hand, (2) any change in
skin temperature, (3) any swelling or edema, (4) any skin dryness, (5) any
changes in the skin texture, (6) any atrophy, or (7) any changes in the nails,
but he did note that Swanigan had stiffness in the joint due to flexion
deformity of the finger as a result of the injury.  Page four of Dr.
Chandrakar’s report notes under “Neurological Examination” that Swanigan’s
“[s]ensation to pinprick and light touch was decreased in the right little
finger, medial and lateral aspects.”  Dr. Chandrakar testified that he
performed the pinprick test to check sensation and to identify whether there
was a digital nerve injury.  Dr. Chandrakar noted that Swanigan had
hypersensitivity in his fingers on either side of the distal joint.  Dr.
Chandrakar found that Swanigan had no pain when his elbows, wrists, or hands
were palpitated.  Dr. Chandrakar did not find anything in his evaluation that
would lead him to conclude that Swanigan had CRPS.[11]
 Dr. Chandrakar’s diagnosis of Swanigan was “[i]njury to the right little
finger, crush injury; and a second diagnosis, excision of neuroma, right little
finger.”

          Dr.
Chandrakar examined Swanigan again on January 18, 2008, and found no changes
from the previous exam.  Dr. Chandrakar found no atrophy; the skin texture was
normal; the sweat patterns, color, and temperature of the hand were normal; the
venous circulation and capillary profusion were within normal limits; and there
was no pain in response to palpitation of the elbows, wrists, and hands.  The
nails and hair growth on the hand were not mentioned in the report.  Dr.
Chandrakar testified that the hyperesthesia that Swanigan had on the initial
examination could have been related to his initial nerve injury or to the
neuroma that was excised.  As of the second examination, it appeared that the
hyperesthesia in the IP joint had resolved. 

          On
cross-examination, Dr. Chandrakar agreed that hypersensitivity to stimuli is a
hallmark sign of CRPS and that CRPS or RSD is difficult to diagnose.  Dr.
Chandrakar testified that in his normal practice, he does not make a diagnosis
of RSD or CRPS; he refers out patients to get such diagnosis.

2.  Dr. Graybill’s
Testimony That Swanigan Suffered

From RSD/CRPS Was Not
Conclusory

 

          Charter
Oak argues in its second subissue that Dr. Graybill’s testimony was conclusory
and thus constitutes no evidence that Swanigan suffered from RSD/CRPS.  We have
previously held that Charter Oak waived any legal sufficiency complaint
concerning whether Swanigan suffered from RSD/CRPS by failing to object to the
jury question on the ground that it assumed this disputed fact.  We nonetheless
alternatively hold here that, in any event, Dr. Graybill’s testimony that
Swanigan suffered from RSD/CRPS was not conclusory but was based on the facts
he discerned and documented during his fourteen-month treatment of Swanigan.

Specifically,
Charter Oak contends that because Dr. Graybill was not familiar with the fourth
and fifth editions of the AMA Guides and because he relied on his
training and experience, rather than on x-rays or triple-phase bone scans, his
diagnosis that Swanigan had CRPS and his opinion that the May 18 injury caused
Swanigan’s CRPS were conclusory.

As
set forth above, Dr. Graybill did rely on his training and experience in
diagnosing Swanigan with CRPS, but the criteria, the “hallmark symptoms,” that Dr.
Graybill discerned through his training and experience and that supported a diagnosis
of CRPS were the same as most of the “clinical findings” set forth in the AMA
Guides.  Dr. Graybill’s testimony, as well as his notes that were admitted
into evidence without objection, reveal that in making the diagnosis that
Swanigan suffered from RSD/CRPS, he considered skin temperature changes, skin color
changes, sweating, atrophy, changes in the nail bed, changes in the skin, range
of motion limitations, and transient responses to stellate ganglion blocks. 
These considerations parallel the “clinical findings” that Charter Oak’s expert
Dr. Mitchell testified were required in order for someone to have a correct
diagnosis of RSD/CRPS per the AMA Guides.  Dr. Mitchell testified:

The cardinal signs
[of RSD per the AMA Guides] are what are called vasomotor changes and
sudomotor changes.  Vasomotor being temperature regulation, color, may cause
swelling.  Sudomotor is dry skin or increased sweating, decreased range of
motion, atrophy of the skin are the sort of physical findings.

 

Q.  Okay.  What is a
trophic change?

 

A.  Trophic is really
atrophy or wasting.  It could be the hair or the skin, the nails, as far as
this particular syndrome is concerned.

 

          . . . .

 

Q.  Are all of those
signs necessary or are only some of them necessary to be present?

 

A.  Usually some of
them. The criteria for RSD, there are eight.  And if you have five, you can
make the diagnosis.

 

          . . . .

 

Q.  Okay.  What about
complex regional pain syndrome, what are the signs or findings that are
required in order to have that diagnosis?

 

A.  Well, in the 5th
edition, it expands it a little.  The guide to impairment expands it a little
bit.  It’s pretty much the same, vasomotor and sudomotor, but it expands the
trophic changes --

 

Q.  Okay.

 

A.      -- a little
bit.  So it’s color change; temperature, cold usually; increased sweating; dry
skin.  And then the trophic changes can cause change in motion, nail changes,
atrophy, shiny skin, decreased range of motion by getting stiff.  That’s pretty
much it.

Thus,
we cannot say that Dr. Graybill’s testimony based on his training and experience––using
the same factors as Dr. Mitchell testified were used in the AMA Guide––was
conclusory.  In fact, Dr. Graybill’s testimony and the medical records in
evidence from Dr. Graybill, Dr. Toledo, Dr. Willis, and Dr. Solomon document
that Swanigan exhibited the very “clinical findings” that Dr. Mitchell
testified were necessary to support a diagnosis of RSD/CRPS under the AMA
Guide.  The record reflects that Dr. Graybill and Dr. Mitchell reached
different conclusions as to whether Swanigan suffered from RSD/CRPS after
looking at the same criteria.

An
expert opinion is conclusory when it offers an opinion with no factual
substantiation.  See generally Coastal Transp. Co., 136 S.W.3d at 232; Burrow
v. Arce, 997 S.W.2d 229, 236 (Tex. 1999).  Here, Dr. Graybill’s opinions
that Swanigan suffered from RSD/CRPS are not conclusory; the opinions are based
on facts and criteria in the record documenting Dr. Graybill’s fourteen-month
treatment of Swanigan.

We
therefore, in the alternative to our holding that Charter Oak waived its legal
sufficiency challenge to whether Swanigan suffers from RSD/CRPS by failing to
object to the charge, hold that the evidence is legally sufficient to support
the jury’s finding that Swanigan suffered from RSD/CRPS.

3.  Dr. Graybill’s Testimony
that Swanigan’s May 18 Injury Was a Producing Cause of His RSD/CRPS Was Not
Conclusory

 

          As
set forth above, Dr. Graybill repeatedly testified that Swanigan’s RSD/CRPS was
caused by his May 18 on-the-job injury.  Charter Oak offered no controverting
evidence or testimony; Charter Oak’s position was that Swanigan did not suffer
from RSD/CRPS.  We hold that Dr. Graybill’s testimony and opinion that
Swanigan’s May 18, 2006 injury was a producing cause of his RSD/CRPS was not
conclusory but was grounded in the facts he ascertained and documented in his
medical records concerning Swanigan’s symptoms and treatment.  See Transcon.
Ins. Co. v. Crump, 330 S.W.3d 211, 220 (Tex. 2010) (holding that expert
medical causation testimony was based on reliable foundation and was admissible
to prove that May 2000 injury was producing cause of appellee’s death and
further holding that “we cannot disturb the jury’s finding against [insurer] on
the issue of producing cause”).

4.  Legal Sufficiency
of All the Evidence to Establish

Swanigan’s May 18 Injury
Was a Producing Cause of His RSD/CRPS

 

          Because
there was no objection to the jury charge, we review all of the evidence in the
light most favorable to the verdict to determine whether a reasonable trier of
fact could have formed a firm belief or conviction that Swanigan’s injury of
May 18 was a producing cause of his RSD/CRPS.  See Sturges, 52 S.W.3d at
715.

Swanigan
testified that his right pinkie finger was fine after the barbeque pit injury;
he said he could lift 110- to 120-pound transmissions without pain at Carmax. 
He said that after the crush injury to his right pinkie finger at Carmax, he
could not bend his finger.  This affected his ability to grip and grasp; his
hand and whole arm twitched; his pain level was at a six and a half out of ten;
the chronic pain interfered with his ability to sleep and caused him to become
easily irritated and to “snap”; and the pain had affected his ability to be a father
to his children.

          Three
experts (Dr. Graybill via his testimony and Drs. Willis and Solomon via
Swanigan’s medical records from their offices––all treating medical doctors of
Swanigan) concluded that Swanigan had RSD/CRPS following the May 18, 2006
on-the-job crush injury to his right pinkie finger.  The record contains no
controverting evidence on any other producing cause of Swanigan’s RSD/CRPS.[12] 
Dr. Mitchell testified that he found no findings consistent with RSD/CRPS, but
he admitted that a crush injury can lead to RSD/CRPS and that a burning
sensation, like Swanigan had, that is not explainable by the injury is a
hallmark sign of RSD/CRPS.

We
hold that viewing all of the evidence—Swanigan’s testimony, Dr. Graybill’s
testimony, as well as the unobjected-to medical records and reports from Dr.
Graybill, Dr. Toledo, Dr. Willis, and Dr. Solomon (which document Swanigan’s
exhibition of various signs of RSD/CRPS to various doctors following the May 18
on-the-job crush injury to his right pinkie finger), and the testimony of Drs.
Mitchell and Chandrakar—in the light most favorable to the jury’s finding that
Swanigan’s May 18 injury was a producing cause of his RSD/CRPS (because a
reasonable factfinder could) and disregarding the contrary evidence—we have
located none in the record—more than a scintilla of evidence exists that
Swanigan’s May 18 injury was a producing cause of his RSD/CRPS.  See, e.g., Cent.
Ready Mix Concrete Co., 228 S.W.3d at 651; Liberty Mut. Ins. Co. v. Burk,
295 S.W.3d 771, 780 (Tex. App.—Fort Worth 2009, no pet.) (holding evidence
legally sufficient to support finding that appellee’s work-related injury
caused his polyneuropathy and foot ulceration); Hartford Underwriters Ins.
Co. v. Burdine, 34 S.W.3d 700, 707 (Tex. App.—Fort Worth 2000, no pet.)
(holding evidence legally sufficient to support finding that appellee’s injury
to legs and/or feet was producing cause of the total and permanent loss of use
of both legs and/or feet at or above the ankles); Escalante, 162 S.W.3d at
625; Am. Cas. Co. of Reading, PA v. Zachero, No. 11-07-00183-CV, 2008 WL
5205642, at *5 (Tex. App.—Eastland Dec. 11, 2008, no pet.) (mem. op.) (holding
evidence legally sufficient that appellee’s injury extended to include
osteoarthritis and chondromalacia); Fidelity & Cas. Co. of NY v. Rust,
No. 05-97-001509-CV, 2001 WL 51066, at *4 (Tex. App.—Dallas Jan. 23, 2001, pet.
denied) (not designated for publication) (holding evidence legally sufficient
to support trial court’s judgment because the jury could have determined from
the evidence that appellee’s head injury was the producing cause of his mental
illness).  We overrule Charter Oak’s sole issue.

V.  Conclusion

          Having
overruled Charter Oak’s sole issue, we affirm the trial court’s judgment.

 

 

SUE WALKER
JUSTICE

 

PANEL: 
WALKER,
MCCOY, and MEIER, JJ.

 

DELIVERED:  April 26, 2012









[1]See Tex. R. App. P. 47.4.





[2]Swanigan explained that
the procedures were “more or less like a major surgery.”  He was placed in a
small operating room, was administered oxygen, and was monitored with
electrical sensors while he was put to sleep.  During the procedure, he
received injections in his neck.





[3]The
progress note is dated September 22, 2008, but at the bottom it states that it
was dictated “08/08/08.”  Swanigan testified that he saw Dr. Solomon on
September 22, 2008, and therefore we use that date.





[4]Swanigan objected to the
charge, stating:

I think that the question should reflect the issue as
adopted by the CCH administrative judge, which includes did the injury extend
to [and] include the CRPS and RSD.  I think the extend to and include need to
be included as part of it.

The trial court overruled
Swanigan’s objection and submitted the above question.  Charter Oak lodged no
objections to the charge.





[5]To the extent that
Swanigan’s prior injury to his right pinkie finger could be considered an
“other possible cause,” Swanigan did refute this via his testimony that his
right pinkie finger was fine after the barbeque pit injury and that he could
lift 110- to 120-pound transmissions without pain at Carmax prior to the May 18
injury.





[6]Below we nonetheless
alternatively examine the legal sufficiency of the evidence to establish that
Swanigan suffers from RSD/CRPS and conclude that legally sufficient evidence
exists to establish that Swanigan suffers from RSD/CRPS.





[7]Dr. Graybill said that CRPS
was also known as Complex Regional Pain Syndrome.  Dr. Graybill further explained
that Type I of CRPS is RSD and that Type II is causalgia.





[8]Dr. Graybill said that in
the acute phase, it is very painful to move the joints.





[9]Swanigan testified that
Dr. Mitchell’s examination took less than ten minutes and that Dr. Mitchell did
not touch him.





[10]Swanigan testified that
Dr. Chandrakar’s examination consisted of only questions and lasted less than
ten minutes.  Dr. Chandrakar told Swanigan as soon as he walked into the
examining room that the insurance company did not recognize CRPS.  Swanigan did
not feel confident in Dr. Chandrakar’s grasp of RSD/CRPS.





[11]Dr. Chandrakar was not
aware that Swanigan had undergone a triple-phase bone scan, but he was aware
that such scans are useful in diagnosing or ruling out CRPS.





[12]Two experts (Dr. Mitchell
and Dr. Chandrakar—both doctors hired by Charter Oak who spent less than ten
minutes each with Swanigan and did not touch his hand or arm) concluded that
Swanigan did not have RSD/CRPS, but no controverting producing cause evidence
exists (as opposed to evidence that Swanigan did not suffer from RSD/CRPS).